### In re CURTIS CENTER LIMITED PARTNERSHIP, Debtor.

#### Bankruptcy No. 95–12616 SR.

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 16, 1996.

Frederic J. Baker, Asst. U.S. Trustee, Philadelphia, PA.

Jeffrey Kurtzman, Morton R. Branzburg, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Debtor.

Thomas E. Biron, Regina Kelbon, Blank Rome Comisky & McCauley, Philadelphia, PA, for Sumitomo Trust & Banking Co.

Pauline K. Morgan, Clark Ladner Fortenbaugh & Young, Philadelphia, PA, for Official Committee of Unsecured Creditors.

Joseph A. Dworetzky, City Solicitor, Cynthia E. White, Chief Deputy City Solicitor, City of Philadelphia, Law Dept., Philadelphia, PA, for the City of Philadelphia.

## *OPINION*

STEPHEN RASLAVICH, Bankruptcy Judge.

### *Introduction.*

Before the Court is the Second Motion of Sumitomo Trust and Banking Co. Ltd., New York Branch, (hereinafter "Sumitomo") for relief from the automatic stay (the "Motion") Answers in opposition to the Motion were filed by the above Chapter 11 Debtor, Curtis Center Limited Partnership (hereinafter the "Debtor" or "Curtis Center") and the Official Committee of Unsecured Creditors. Hearings were held January 3, 1996 and January 17, 1996, and the issues raised have been extensively briefed by the parties. For the reasons which follow the Motion will be denied.

### *Background.*

The instant Chapter 11 case was commenced on April 4, 1995. From its inception it has featured an ongoing *battle royale* between the Debtor and Sumitomo. Most disputes have been resolved by the Court from the Bench, and to date the Court has not yet had occasion to prepare a written opinion. Written findings, however, are appropriate in this instance. A chronology of the more relevant events is thus appropriate.

The Debtor is a Pennsylvania limited partnership formed in 1984 to acquire and renovate an historically certified twelve story office building located at 6th and Walnut Streets, Philadelphia, Pennsylvania. The building contains approximately 785,000 square feet of "rentable" commercial office space, 31,000 square feet of rentable retail space and 25,000 square feet of rentable storage space. There is also a 250 unit underground parking garage. The totality of ownership interests in the realty and its improvements is shared between the Debtor and its affiliated entity, Washington Square Limited Partnership. (hereinafter "Washington Square") That is to say, Washington Square owns the ground and the improvements, but has leased both to the Debtor pursuant to separate long term "land" and "building" leases.[1] Renovation of the property, has been completed for some years and was financed, in part, through a loan from Mellon Bank (East), N.A. ("Mellon"), and in part with some $38,000,000 in equity investments raised from the Debtor's limited partners. The building was further leveraged in January 1990 with a $95,000,000 working capital credit facility extended by Sumitomo. Sumitomo's three loans under the credit facility are evidenced by promissory notes and are secured, in their entirety, by a first mortgage lien on the combined interests in the realty and improvements of both the Debtor and Washington Square, as well as by a collateral assignment of tenant leases and rents. There also exists a related agreement which, *inter alia*, subordinates the entire Mellon indebtedness, as well as a junior secured mortgage debt of the Debtor to Washington Square, to the debt of Sumitomo. Sumitomo's loans were due to mature on June 13, 1995, however in April of the same year the Debtor and Washington Square defaulted by failing to remit a quarterly interest payment. That triggered the filing of the instant Chapter 11 case.

The rents of Curtis Center tenants are cash collateral in this proceeding within the meaning of 11 U.S.C. § 363. The Debtor has continued in possession and control of the building and its operations during the case, using the rentals to pay operating and capital expenses pursuant, mostly, to a consensual series of stipulations with Sumitomo. These stipulations, together with certain other orders of Court, have also provided for the

---

1. Technically speaking, the Debtor apparently "owns" the building and related improvements for depreciation purposes under the terms of the building lease, but ownership thereof reverts back to Washington Square upon expiration of the lease term. (Building Lease at page 8). This fact is not without significance, as will be discussed, *infra.*

Debtor's remission of certain post petition "adequate protection" payments to Sumitomo from excess cash flow.

Sumitomo first moved for relief from the automatic stay on June 6, 1995. In its first Motion, Sumitomo sought relief from the automatic stay under both subsections of 11 U.S.C. § 362(d). In this respect, Sumitomo alleged that "cause" existed under 11 U.S.C. § 362(d)(1) for the entry of an Order modifying the automatic stay for the following reasons:

(a) Sumitomo lacks adequate protection of its lien on the Debtor's interest in the Curtis Center, including, *inter alia,*

(i) the Debtor's inability to make debt service payments to Sumitomo

(ii) the Debtor's inability to pay the real estate taxes required under the Mortgage Agreement.

(iii) the value of the Debtor's interest in the Curtis Center has been and continues to decline.

(b) Debtor's inability to propose a confirmable plan for, *inter alia,* the following reasons:

(i) the rents from the Curtis Center are Sumitomo's collateral and are accumulating for Sumitomo's benefit, and the Debtor cannot use them to fund a plan of reorganization without Sumitomo's consent, which consent Sumitomo will not give. *See In re Union Meeting Partners,* 178 B.R. 664 (Bankr.E.D.Pa. 1995).

(ii) Sumitomo's claim is woefully under-secured and its deficiency claim prevents the Debtor from proposing a plan which can satisfy the requisite elements of Section 1129 without Sumitomo's consent. *See In re Swedeland Development Group, Inc.,* 16 F.3d 552, 568 (3d Cir. 1994); *John Hancock Mutual Life Ins. v. Route 37 Business Park Associates,* 987 F.2d 154, 161 (3d Cir.1993).

(iii) even though the amount of general unsecured claims is relatively small, the huge amount of unsecured insider claims, the Mellon and Washington Square claims and the Sumitomo claim makes unrealistic any plan which pre-

serves value to the Debtor or to its equity security holders, since there is insufficient value to distribute to creditors.

(c) In violation of its obligations under the Bankruptcy Code, specifically Section 704(7) made applicable to Chapter 11 debtors in possession by Section 1106(a)(1) and 1107(a), Debtor refuses to cooperate with Sumitomo's requests for the information Sumitomo requests to monitor the operations at the Curtis Center, information about the Debtor's assets, liabilities, business and conduct, and access to Debtor's books and records to Sumitomo's agent Heitman/JMB Advisory Corporation.

(d) To Sumitomo's knowledge, the Debtor has taken no action to formulate a plan of reorganization. Sumitomo has received no proposals.

Sumitomo further alleged that "cause" existed for the entry of an Order modifying the stay under 11 U.S.C. § 362(d)(2) for the following reasons:

(a) The Debtor has no equity in its interest in the Curtis Center.

(b) The Debtor's interest in the Curtis Center is not necessary for an effective reorganization in that:

(i) the Debtor cannot propose a confirmable plan and no reorganization is possible without the consent of Sumitomo;

(ii) since Sumitomo holds an assignment of the rents from the Curtis Center, there is no operating income which the Debtor can utilize to operate its business without providing Sumitomo with adequate protection which the Debtor cannot provide;

(iii) the Debtor cannot utilize the rents, which are Sumitomo's collateral, to fund a plan of reorganization; and

(iv) even though the amount of general unsecured claims is relatively small, the huge amount of unsecured insider claims, the Mellon and Washington Square claims and the Sumitomo claim makes unrealistic any plan which preserves value to the Debtor or to its equity security holders since there is

insufficient value to distribute to creditors.

(c) To Sumitomo's knowledge, the Debtor has taken no action to formulate a plan of reorganization. Sumitomo has received no proposals.

(d) This is essentially a single asset real estate case involving a two-party dispute between Sumitomo and the Debtor. The automatic stay effectively holds only Sumitomo hostage to this Chapter 11 case because there is no value available for other creditors or for the Debtor and its equity security holders. There is no societal gain or advantage to be served by a reorganization. A confirmed reorganization plan will not further employment or the continuing of business at the Curtis Center. Business at the Curtis Center will continue even if Sumitomo pursues the remedies in the Mortgage Agreement and other loan documents. If permitted to foreclose, Sumitomo or a successful Marshal's sale purchaser will succeed to ownership of the Debtor's interest in the Curtis Center, and to continue operating the Curtis Center, will need to employ individuals and contract with third-party servicers, and will continue to lease space to tenants. Thus, the breathing spell accorded the Debtor by the automatic stay should end.

Answers in opposition to Sumitomo's first Motion for relief from the stay were filed by both the Debtor and the Committee and a lengthy, consolidated, evidentiary hearing was held July 28, 1995, with respect to the Sumitomo lift stay motion, as well as with respect to the Debtor's requests for continued use of cash collateral and an extension of the exclusivity period afforded to it under 11 U.S.C. § 1121(d), both of which requests were opposed by Sumitomo.

Evidence presented at the hearing on July 28, 1996 clearly established a number of facts. First, regardless of which parties' expert appraiser was more convincing, it was undisputed that Sumitomo is substantially under-secured. Its proof of claim filed July 14, 1996 states an indebtedness for loans made pursuant to its credit agreement with the Debtor in the aggregate amount of $84,027,080.94, plus accrued and accruing fees, costs and expenses. Sumitomo's April 1, 1995 Ernst & Young market valuation of the Curtis Center values the leasehold and fee interests together at $60,500,000, and pegs the value of the Debtor's separate leasehold interest alone at $34,000,000. In contrast, the Debtor offered valuation evidence from Reeves C. Lukens Co. which suggested a market value of the entire property as of January 1, 1994 in the amount of $52,500,000.[2] The Debtor's purpose in presenting the foregoing valuation testimony, appears to have been to establish that, in the interval between January, 1994 and April, 1995, the property had significantly appreciated in value. Weighing somewhat against this proposition, however, was evidence that the Debtor itself had utilized the Lukens appraisal in 1994 for purposes of appealing what it contended was an overly high real estate tax assessment by the + City of Philadelphia. The Debtor ultimately settled the appeal by agreeing to a $59,500,000 fair market valuation of the property in 1994. The latter fact clearly undercut the Debtor's contention that its prepetition stewardship of the property had produced a significant escalation in market value in the near term. The appraisal testimony did, at a minimum, however, confirm that Sumitomo's indebtedness was substantially under-secured, and satisfactorily establish that there had at least been no material deterioration in the value of Sumitomo's collateral in roughly the year preceding the inception of the Bankruptcy case. The evidence likewise established, rather clearly, that the Curtis Center was being profitably operated post-petition and that the building was in good repair and well maintained. In particular, there was no dispute that the Debtor had met or exceeded all of its projections with respect to monthly post-petition revenues and expenses. Reasonable efforts, furthermore, appear to have been underway to stabilize and/or increase tenancies. In the face of such evidence, the Court had little hesitancy in concluding that Sumitomo's interest in the Curtis Center was adequately

---

**2.** The Debtor's Schedules list the property's aggregate value on the filing date as $75,000,000, but the Debtor offered little, if anything, in the way of support for this figure.

protected and that no cause to vacate the stay under 11 U.S.C. § 362(d)(1) existed at that juncture. Sumitomo's case with respect to 11 U.S.C. § 362(d)(2), however, presented a somewhat closer question.

■■■ In this vein, the parties' dispute focused not on the presence or absence of equity. That question was already resolved. Rather, the dispute focused on the second prong of 11 U.S.C. § 362(d)(2) which provides that where the absence of equity is demonstrated, the Court must grant relief if the Debtor fails to prove that the property in question is necessary to its effective reorganization. While differing sharply as to the facts, the parties at least were in agreement as to the applicable law. As construed by the Supreme Court in *United Savings Association v. Timbers of Inwood Forest Associates Limited,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), an "effective reorganization" requires "a reasonable possibility of a successful reorganization within a reasonable time." *Timbers,* 484 U.S. at 375–376, 108 S.Ct. at 633. Or, as alternatively put by the Third Circuit Court of Appeals in *John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 157 (3d Cir.1993), the "effective reorganization" requirement enunciated by the Supreme Court in *Timbers* requires a showing by the Debtor that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed. The corollary to this, as noted later by the Third Circuit Court of Appeals in *In re Swedeland Development Group Inc.* 16 F.3d 552 (3d Cir.1994) *en banc,* is that the failure of the Debtor to demonstrate that an effective reorganization is in prospect mandates modification of the Bankruptcy stay.

The crux of Sumitomo's argument in the foregoing context was premised on two assumptions: first, Sumitomo assumed that given the size of its code created deficiency claim it would overwhelmingly dominate the class of unsecured creditors; and second, it assumed that without the accepting vote of the unsecured class, (a possibility precluded by the negative vote, Sumitomo intended to cast) the Debtor would lack the accepting impaired class required under 11 U.S.C. § 1129(a)(10) and would therefore be unable to achieve cramdown of any reorganization plan under 11 U.S.C. § 1129(b).

The Debtor's response to the asserted futility of its prospects was vigorous but less than overwhelming. The Debtor's principal rebuttable argument related to a pre-petition lender liability lawsuit initiated by the Debtor and Washington Square against Sumitomo and an entity known as Heitman/JMB Advisory Corporation. The lender liability action complains of a failure by Sumitomo to approve a letter commitment regarding a proposed lease between the Debtor and a prospective tenant known as Day & Zimmerman International, Inc., and of a further unreasonable refusal on the part of Sumitomo, to restructure the Curtis Center loans. These actions, the Debtor alleges, were part of a scheme orchestrated by Sumitomo to "force Plaintiff's into Bankruptcy and deprive them of their interests in the Curtis Center." (Complaint at Introduction) The lender liability lawsuit was commenced in the Court of Common Pleas for Philadelphia County but has since been removed by Sumitomo, which vigorously denies all liability, to the United States District Court for the Eastern District of Pennsylvania, where it remains pending at Docket # 95–1465. In the context of Sumitomo's § 362 Motion, the relevance of this lawsuit, in the Debtor's view, was twofold. First, the Debtor maintained that the existence of this lawsuit created a sufficient distinction between the unsecured deficiency claim of Sumitomo, and the unsecured claims of other trade creditors, such that the Debtor could separately classify Sumitomo's unsecured deficiency claim in any plan it might later put forth. This, it asserted, would enable the Debtor to modestly impair the proposed treatment of its remaining trade creditors and, if such treatment were accepted by them, to still satisfy the requirements of 11 U.S.C. § 1129(a)(10). In the alternative, the Debtor implied that its success in the lender liability litigation might result in the reduction of Sumitomo's deficiency claim to an amount which might limit its ability to dominate the unsecured class. To the foregoing, the Debtor appended two follow up arguments. First, the Debtor asserted that leaving aside the class of unsecured creditors

there would be other classes of creditors which would be impaired under its prospective reorganization plan, and whose acceptance of such treatment would enable it to satisfy the requirements of 11 U.S.C. 1129(a)(10). Furthermore, if all else failed, or in the event that Sumitomo made an election to be considered "fully secured" as permitted under 11 U.S.C. § 1111(b), the Debtor argued that it could seek to refinance the property and deal with Sumitomo in that fashion. Neither of the latter two suppositions was greatly reassuring based on the record made, however neither was outrightly implausible on its face.

After considering the record and the arguments of the parties, and although the Court had preliminary skepticism as to the Debtor's ability to separately classify Sumitomo's deficiency claim, the Court nevertheless did not view the Debtor's ability to propose a potentially confirmable plan of reorganization to be so patently infeasible at that relatively early date as to require vacating the automatic stay under the guidelines of *John Hancock* and *Swedeland, supra.* Thus, despite Sumitomo's plethora of objections, and by Order dated August 1, 1995, the automatic stay was continued in effect, subject, however, to the condition that the Debtor tender the sum of $500,000 to Sumitomo within three business days from its post-petition cash reserves. No agreement as to the application of this payment was struck by the parties at that time, nor does the Order of August 1, 1995 address that question. The Order did, however, also approve the Debtor's continued use of cash collateral through September 30, 1995, and grant the Debtor a reduced, thirty day extension of exclusivity under 11 U.S.C. § 1121. A follow-up hearing to consider the propriety of further relief under 11 U.S.C. § 362(d)(1) was scheduled for September 11, 1995.

The hearing of September 11, 1995 was continued until September 13, 1995, with the status quo as to the Debtor's exclusivity maintained. That hearing resulted in an Order of even date which, for reasons more fully stated in open court, extended the Debtor's period of exclusivity for one final month. Consistent with that restriction, the Debtor filed its initial plan and disclosure statement on October 13, 1995.

The Debtor's initial plan divided its creditors into eight classes, as follows:

2.1 *Class 1—Claim of the Sumitomo Trust & Banking Co., Ltd., New York Branch.* Class 1 shall consist of the Sumitomo Claim, as to which Sumitomo holds a first priority mortgage on the Property. Class 1 includes all of the claims of Sumitomo against the Debtor of any kind or nature whatsoever, including any unsecured deficiency claims, and no other claims of Sumitomo shall be included in or treated under any other class of claims under the Plan. Class 1 is impaired under the Plan.

2.2 *Class 2—Allowed Claim of Mellon Bank (East), National Association.* Class 2 shall consist of the Allowed Claim of Mellon, which holds a second priority mortgage on the Property. Class 2 includes all claims of Mellon against the Debtor of any kind or nature whatsoever, including any unsecured deficiency claims, and no other claims of Mellon shall be included in or treated under any other class of claims under the Plan. Class 2 is impaired under the Plan.

2.3 *Class 3—Allowed Claim of the City of Philadelphia.* Class 3 shall consist of the Allowed Claim of the City of Philadelphia for pre-petition real estate taxes, and any other taxes, fees and charges due and owing to the City of Philadelphia for or in connection with the Property as of the Petition Date. Class 3 is impaired under the Plan.

2.4 *Class 4—Priority Claims.* Class 4 shall consist of the Allowed Claims of any Claimant to the extent that any such claims are entitled to priority under Section 507 of the Bankruptcy Code, other than Allowed Class 3 Claims. Class 4 is not impaired under the Plan.

2.5 *Class 5—Allowed General Unsecured Claims.* Class 5 shall consist of the Allowed General Unsecured Claims against the Debtor, excluding (i) any unsecured deficiency claims of Sumitomo or Mellon, (ii) any Insider Unsecured Claims and (iii)

any claims relating to Tenant Security Deposits. Class 5 is impaired under the Plan.

2.6 *Class 6—Allowed Insider Unsecured Claims.* Class 6 shall consist of the Allowed General Unsecured Claims of Insiders, excluding Class 7 Claims. Class 6 is impaired under the Plan.

2.7 *Class 7 Allowed Claim of Washington Square Limited Partnership.* Class 7 shall consist of the Allowed Claim of Washington Square, which is secured by a third priority mortgage on the Property. Class 7 is impaired under the Plan.

2.8 *Class 8—Allowed Claims for Tenant Security Deposits.* Class 8 shall consist of the Allowed Claims of tenants for refunds of Tenant Security Deposits. Class 8 is impaired under the plan.

It will be noted that the Debtor's initial plan deftly attempted to avoid the issue of the separate classification of Sumitomo's unsecured deficiency claim by including both components of Sumitomo's claim in a single class, albeit as parts (a) and (b) thereof. As to the secured indebtedness, the plan proposed to extend the maturity date for repayment of the claim for 5 years with monthly interest payable thereon at a presumed "risk free" rate equal to the interest rate on 5 year treasury notes, plus a risk premium of 100 basis points. No payments on the unsecured portion of the Sumitomo claim were to be made until the lender liability litigation was fully completed; following which the claim was to be paid in full through monthly remittances of all net cash flow generated from the property.

Sumitomo expressed its unhappiness with the Debtor's first plan on October 26, 1995 by filing a second Motion for Relief from the Automatic Stay, together with a Motion to terminate the Debtor's exclusivity so that Sumitomo might file its own plan. Hearings on both Motions were originally scheduled for December 6, 1995. On November 13, 1995, Sumitomo followed up with a lengthy series of written objections to approval of the Debtor's disclosure statement, a hearing on which was scheduled for November 16, 1995. At the disclosure statement hearing Sumitomo renewed, *inter alia,* its argument that the Debtor's plan was patently unconfirmable because it lumped Sumitomo's deficiency claim in a single class with its secured claim or, put differently, that the plan was unconfirmable because it separately classified this unsecured claim from the claims of other unsecured creditors. When pressed by the Court to address this issue, the Debtor offered only the argument it had advanced at the first § 362 hearing; to wit: that the pending lender liability litigation provided justification to separately classify Sumitomo's deficiency claim. The contested disclosure statement was thereupon taken under advisement by the Court pending the hearing scheduled for December 6, 1995.

When the hearing of December 6, 1995 was convened, the Court had not yet ruled on the adequacy of the Debtor's Disclosure Statement. At the outset the Court did, however, advise the parties of its view that its own reading of the Court of Appeals decision in *John Hancock, supra,* convinced it that the Debtor could not separately classify Sumitomo's deficiency claim if the same were for the purpose of enabling it to gerrymander for itself an accepting impaired class of creditors. The Debtor responded at this juncture with the argument that the charge of gerrymandering was unfounded, and indeed a red herring, because the Debtor had various other classes of creditors whose treatment the Debtor intended to impair and whose acceptance of such treatment the Debtor anticipated. The Debtor nevertheless indicated an intention to amend the Disclosure Statement on the table. The parties thereupon stipulated to expiration of the Debtor's exclusivity period, and the Court adjourned the December 6, 1995 hearing to January 3, 1996 directing that the Debtor, within that time, put forward an amended disclosure statement and plan, free of any patent fatal flaws.

Consistent with the foregoing mandate, the Debtor filed amended schedules and an amended plan and disclosure statement on December 22, 1995. Under its amended plan, the Debtor's creditors have expanded to ten classes. The two new classes consist of a separate class of its own for Sumitomo's deficiency claim and a separate class for "tenants having offset rights." The Sumitomo defi-

ciency claim still receives treatment different from the essentially 100% effective day payout proposed for general trade creditors. In particular, the plan again provides that Sumitomo is to receive nothing on account of its deficiency claim until the lender liability litigation and any appeals are fully resolved and then, if its deficiency claim has survived in whole or in part, payment is still to be deferred with the debt retired over time from excess cash flow.

A continued hearing on Sumitomo's § 362 hearing was convened as scheduled on January 3, 1996, and concluded on January 17, 1996. At these hearings the Court reiterated its skepticism as to both the separate classification of Sumitomo's unsecured claim, and the gerrymandering strategy it appeared to embody, as well as to the apparently discriminatory treatment proposed for the Sumitomo unsecured claim versus that proposed for the unsecured claims of general trade creditors. In the former respect, the Court noted that while it was true that the Debtor's amended disclosure statement and plan included three potentially accepting impaired classes other than Sumitomo and trade creditors; the classes were all of suspect validity. The three classes in question consist of the City of Philadelphia, Mellon Bank and a single tenant with an admitted right of offset due to an overpayment of its utility charges. Oral argument was heard on the issues raised and the parties, upon request, have submitted written memoranda with respect to the status in this case of the City of Philadelphia. The Sumitomo § 362 Motion is thus now ripe for adjudication.

***Discussion.***

■ At the outset, the Court reiterates its conclusion that under the holding of the Third Circuit in *John Hancock, supra,* a Debtor may not separately classify a secured creditor's deficiency claim for the purpose of securing acceptance of a reorganization plan by an accepting impaired class of creditors. Indeed, in this respect our Court of Appeals in *John Hancock* noted with unreserved approval the observation of the Fifth Circuit Appeals Court in *Matter of Greystone III Joint Venture,* 948 F.2d 134 (5th Cir.1991), *cert. denied,* 506 U.S. 821, 113 S.Ct. 72, 121

L.Ed.2d 37 (1992), that "the one clear rule that emerges from otherwise muddled case law on § 1122 claims classification" is that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *John Hancock, supra* at 159. In *John Hancock,* the Court of Appeals reiterated its own views stated in *Matter of Jersey City Medical Ctr.,* 817 F.2d 1055, 1061 (3d Cir.1987) that while the Bankruptcy Code does not expressly provide that "substantially similar" claims may not be placed in separate classes:

> There must be some limit on a debtor's power to classify creditors in such a manner [to assure that at least one class of impaired creditors will vote for the plan and make it eligible for cram down consideration by the court]. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*Id.,* quoting *In re U.S. Truck Co., Inc.,* 800 F.2d 581, 586 (6th Cir.1986) (footnote omitted).

■ In *John Hancock,* the Appeals Court rejected the proposed separate classification of a lender's deficiency claim where the same was premised primarily on the basis that the Debtor's unsecured trade creditors held recourse claims against the Debtor partnership's general partners, whereas the lender did not. It also rejected the alternative argument that compelling consolidation of the unsecured claim of the lender with the trade creditors permitted the former to unfairly dilute the voting power of the latter. In *Jersey City Medical,* the Court "immediately note[d]" the reasonableness of distinguishing the claims of physicians, medical malpractice victims, employee benefit plan participants and trade creditors. *Id.* at 1061. Neither *Jersey City Medical,* nor *John Hancock,* thus involved a separate classification proposed on the basis of a pending lawsuit against the sole claimant in one of the separated classes. The Debtor for its part, thus, argues that neither case precludes its pro-

posed treatment of the Sumitomo deficiency claim and that, indeed, its ordering of classes comports with the teachings of such case law. In this respect controlling case law teaches as follows:

> While our opinion in *Matter of Jersey City Medical Ctr.* did not spell out the factors that should be considered in determining whether a classification scheme is reasonable, it seems clear to us that this determination must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed (*see* 11 U.S.C. § 1129(a)(4) (1988)) and treatment of claims under the plan (*see* 11 U.S.C. § 1123(a)(4) (1988)). Thus, where, as in this case, the sole purpose and effect of creating multiple classes is to mold the outcome of the voting, it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed. Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10) (1988).

*John Hancock, supra* at 159.

Consistent with the above, and before analyzing whether the Debtor's classification scheme is reasonable, it is appropriate to determine whether the "sole purpose and effect" of the proposed separate classification is to mold the outcome of voting. As hereinbefore noted, the Debtor maintains that it is not. In particular, the Debtor insists that tenants having offset rights, Mellon Bank and the City of Philadelphia are impaired and potentially accepting creditor classes which will enable it to satisfy the requirements of 11 U.S.C. § 1129(a)(10). The Creditors Committee agrees with the Debtor's analysis. Sumitomo, however, vigorously disputes it.

As to the single tenant scheduled by the Debtor as having an offset right, Sumitomo notes, accurately, that the Debtor's reorganization plan calls for assumption of all unexpired leases upon confirmation of the plan. Assumption of an executory contract under 11 U.S.C. § 365, it likewise notes, requires a curing of all defaults. In this respect, Sumitomo cites *In re Boston Post Road Ltd. Partnership*, 21 F.3d 477, 483 (2d Cir.1994) and *Matter of Greystone III Joint Venture, supra* for the propositions, respectively that tenants whose leases are not assumed or rejected have no provable claims against a Chapter 11 Debtor, while tenants whose leases are assumed must have defaults cured and are entitled to a non-voting administrative expense. Thus, Sumitomo argues this alleged class is wholly illusory. The Court agrees but for a slightly different reason.

Leaving aside the question of whether the delayed return of the instant tenant's prepayment truly represents a "default" by the Debtor under such tenant's lease, such as must be cured under 11 U.S.C. § 365, it is true nevertheless that a cure may be on basically any terms acceptable to the Debtor and the tenant, such that the provisions of 11 U.S.C. § 365 would not be violated where the parties agreed to terms more lenient than the law required. Moreover, for the reasons more fully discussed in this Court's Opinion in *In re Duval Associates Limited Partnership*, 191 B.R. 622 (Bankr. E.D.Pa.1996), it is unlikely that this Court would take issue with any challenge to the proposed impairment of this class on the basis that the same was artificial or *de minimus*. The Court will similarly leave aside the question of whether repayment of the overpayment would be an unsecured claim or an administrative expense. Conclusions in the Debtor's favor on the foregoing issues arguably might support approval of the Debtor's separate tenant class. The inquiry under *John Hancock*, however, must go further. Specifically, the Court according to *John Hancock* must consider first whether the purpose for the creation of a class is to mold the outcome of voting and, if so, to next consider whether the proposed class represents a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision of whether the proposed reorganization should succeed. Having considered this question with respect to the

Debtor's proposed tenant class, the Court concludes that it does not pass muster. There is but one tenant in the ·proposed "offset" class. The proposed means of retiring the prepayment is to permit the tenant to reduce its monthly payment by ⅙ for each of the six months following the effective date of the Debtor's plan. This Court ·is unpersuaded that the creation of this class represents anything other than an attempt to create a separate class of creditors ·solely to mold the outcome of plan voting. Beyond this, the Court does not view the tenant-creditor's interest to be of a magnitude to merit a separate voice in whether this reorganization case should proceed, particularly where, as here, its minor claim could have controlling effect on matters far beyond any relationship to its size. To suggest as much is unreasonable and to permit the same would be a travesty. The Court distinguishes in this respect the separate classification of tenants with deposits approved in *Duval* for in that case the tenants in question were individual residential lessees, some 115 in number, 114 of whom voted in favor of the Debtor's plan. In *Duval* the lender's objection to confirmation went not to the separate classification of the tenants, but to the alleged artificial impairment of their claims under the Debtor's reorganization plan. For the reasons more fully discussed in *Duval,* the Court felt constrained, albeit somewhat reluctantly, to approve the Debtor's cram down reorganization plan, even though compliance with 11 U.S.C. § 1129(a)(10) had been achieved through a *de minimus* impairment of the tenant class. Again, the issue there, however, was not the propriety of the separate classification but the artificial impairment. Accordingly, and for the reasons hereinbefore discussed, the Court agrees with Sumitomo that the Debtor's plan, insofar as it hinges on the accepting vote of the tenant offset class, is patently unconfirmable. A similar conclusion follows upon analysis of the Mellon Bank class.

■ The claim of Mellon Bank is in the approximate amount of $25,000,000. It is subordinate to the claims of Sumitomo and is thus wholly· unsecured. The Debtor's amended plan proposed the following treatment of Mellon's claims:

3.3 *Class 3—Allowed Claim of Mellon.* In full satisfaction of the Class 3 Claim, and except as otherwise set forth herein, Mellon shall be paid the sum of $1,300,000 on the Effective date directly or indirectly from a source other than the Debtor. The sum of $1,300,000 shall be paid to Mellon in a manner that would permit Mellon to retain said funds notwithstanding any subordination agreement between Mellon and Sumitomo. Upon Mellon's receipt of the amount set forth herein, Mellon shall execute and deliver any and all documents necessary or appropriate to satisfy Mellon's claims against the Debtor and to extinguish, satisfy and/or release any liens of record held by Mellon against the Debtor or the Assets, and the personal guaranties of any Insiders. In addition, if and when the Assets are sold and Sumitomo's Allowed Claims have been paid in full, and provided that there are excess sale proceeds available to the Debtor or to allowed Class 8 Claimants, Mellon shall be entitled to ten (10%) of any such excess sale proceeds.

■ Leaving aside the issue of whether there exists any reasonable basis upon which the Debtor might classify Mellon's claim separately from the unsecured claims of Sumitomo and other trade creditors, the Debtor's intended reliance on an assenting vote from an impaired Mellon faces an even more serious obstacle. The Mellon claim, as noted, is subordinate to the claims of Sumitomo pursuant to a comprehensive written subordination agreement. The agreement is part of the instant record by virtue of the incorporation herein of the entire record from the first Sumitomo § 362 hearing on July 31, 1995. The subordination agreement was admitted as Exhibit 9 at the prior hearing. The agreement provides, *inter alia,* that all of Mellon's liens are junior to Sumitomo and that Mellon is subordinate to Sumitomo in right of payment, including any distribution that is to be made to Mellon under any plan of reorganization, or from any other source. Perhaps the most significant feature of the agreement for present purposes, however, is found in paragraph 3 whereat the agreement provides that in the event of bankruptcy,

Sumitomo is authorized on behalf of Mellon to "file all claims, proofs of debt, petitions and other documents required in such statutory or non-statutory proceedings for the full outstanding amount of [Mellon's] debt and prove and vote or consent in any proceedings with respect to any and all claims of [Mellon] relating to [Mellon's] debt, in each case as Sumitomo may deem advisable, in its sole discretion." Nowhere in its memoranda, nor in oral argument have the Debtor or the Committee addressed this rather glaring problem. Sumitomo however, has repeatedly stressed its right to vote Mellon's claim, and has stated matter of factly that it will vote on Mellon's behalf to reject the Debtor's plan. Sumitomo thus argues persuasively that there is no hope that the Debtor will receive an assenting vote from Mellon and its "class" should therefore be disregarded for purposes of evaluating the prospect that the Debtor can comply with 11 U.S.C. § 1129(a)(10). The Court is constrained to agree. The language of the subordination agreement is plain and unambiguous. The terms of this pre-petition agreement are fully enforceable in this Bankruptcy case pursuant to 11 U.S.C. § 510(a) which provides that:

(A) A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

No argument to undercut the efficacy of the subordination agreement or the applicability of above § 510(a) has been offered. In this respect, the Court assumes, although the argument has not really been urged by the Debtor, that it is the Debtor's view that its proposal to pay Mellon from some "source other than the Debtor" such that Mellon may retain the payment regardless of the subordination agreement somehow saves Mellon and/or the Debtor from operation of the subordination agreement. The logic of this notion is unexplained and is wholly unclear to the Court. The Court accordingly rejects the legal theory and concludes that for purposes of 11 U.S.C. § 1129(a)(10) the Debtor cannot rely on Mellon as its potentially accepting impaired class.

This leaves the Debtor with the City of Philadelphia as its sole hope. The Debtor's amended schedules reflect claims held by the City of Philadelphia in two categories. First Schedule D (Secured Claims) reflects a debt of $1,573,466. This relates to accrued real estate taxes. No proof of claim has been filed by the City with respect to this scheduled debt. Additionally, Schedule E (Creditors Holding Unsecured Priority Claims) lists 2 City of Philadelphia claims, as follows:

| Creditor Name and Address [3] | Date Claim was Incurred Consideration for Same | Total Amount of Claim | Amount Entitled to Priority |
|---|---|---|---|
| City of Philadelphia Dept. of Revenue P.O. Box 1529 Philadelphia PA 19105 | 4/17/95 Business Privilege Tax | $55,207 | $55,207 |
| Center City District P.O. Box 8110 Philadelphia PA 19101–8110 | 3/31/95 1995 Center City District Charge | $91,979 | $91,979 |

The City has filed separate proofs of claim for the above two priority claims in the amounts of $27,182.89 and $96,118.36 respectively.

At first blush, there would appear to be little problem with the Debtor looking to the City's secured claim class as its potentially accepting impaired class and, indeed, the Debtor has vocally indicated its intent to do so. Sumitomo, however, has challenged the standing of the City as a creditor of the Debtor with respect to unpaid real estate taxes. Specifically, Sumitomo points out that the registered owner of record of the tax parcels in question is not the Debtor but Washington Square. Thus, it is Washington

---

**3.** The Debtor's amended Schedule E also lists the Commonwealth of Pennsylvania and the Internal Revenue Service as priority creditors, but in such small amounts that the City's vote will control the class.

Square and not the Debtor from whom the unpaid tax obligation runs. In rebuttal, the Debtor notes that under its building and ground leases with Washington Square, it is the Debtor and not Washington Square which is required to pay realty taxes, and indeed that this is what has historically occurred. This is a rather muddled question however. A principal of one of the Debtor's general partners testified in July that Washington Square was the City's taxpayer and that the Debtor had included the obligation on its schedules out of "an abundance of caution." The City of Philadelphia meanwhile has not chosen to file a proof of claim for the realty tax obligation, although it did so with respect to the clearly Debtor owed priority claims. While it is true that the City was not required to file a claim for its scheduled secured claim, the fact of its not having done so, when coupled with the Debtor's own testimony, certainly creates an inference that the attempt to now confer creditor status on the City has compliance with 11 U.S.C. § 1129(a)(10) as its underpinning. The question thus warrants close scrutiny. Given its potential importance to the Debtor's cause, the Court solicited the input of relevant points and authorities from the parties in interest, including the City of Philadelphia. The parties all responded with timely submissions which the Court has considered. Having done so the Court concludes that the Debtor has the better part of the argument and that the City of Philadelphia indeed holds a realty tax claim in this case.

■ Sumitomo argues, reasonably, that under applicable non-bankruptcy law, the "owner" of realty is the party obligated to pay realty taxes, and that under the relevant tax enabling act the owner of realty, where title has been recorded, is the registered owner thereof. 53 Pa.C.S.A. 7101; *Pennsylvania Co. for Insurances on Lives and Granting Annuities, Trustee v. Bergson*, 307 Pa. 44, 159 A. 32 (1932). The Debtor's response to this is threefold: first, it points to *Venango Federal Savings and Loan Association v. County of Venango*, 73 Pa.Commw.Ct. 313, 457 A.2d 1340 (1983) and *In re Blue Knob Recreation, Inc.*, 12 Pa.Commw.Ct. 156, 551 A.2d 9, 10 (1988) for the proposition that in the context of long term leases a

taxing authority may directly assess the lessee as opposed to the registered owner of record. Sumitomo does not disagree with this interpretation, but argues that the holdings of *Venango* and *Blue Knob* must be limited to their facts because in each instance the registered owner/lessor of the subject realty, unlike the lessee, was a tax exempt entity, creating a situation wherein no taxes would be collected if the statute were given a strict, literal interpretation. Sumitomo in effect argues that the "exception" recognized in *Bergson, supra*, and extended in *Venango* and *Blue Knob* is a remedy available only when equity requires its invocation. The facts herein do not warrant recourse to an equitable exception, Sumitomo urges, thus the general rule applies. It strikes the Court that Sumitomo has the better part of this argument. A statutory exception judicially created to deal with instances of fraud and/or gross abuse, is no basis upon which to effectively read the significance of record ownership out of the statute in the context of every long term lease.

The Debtor and Committee argue in the second instance that the City is a third party beneficiary of the leases between the Curtis Center and Washington Square as to those lease provisions which obligate the Debtor to pay all realty taxes. This, it is urged, allows and enables the City to directly assess the Debtor for the taxes in question and establishes its status as a creditor herein. In this respect, the Debtor and Committee rely on Section 302 of the Restatement (Second) of Contracts, adopted by the Pennsylvania Supreme Court in *Guy v. Liederbach*, 501 Pa. 47, 60, 459 A.2d 744 (1983), which creates enforceable rights in "intended" third party beneficiaries, as follows:

§ 302. Intended and Incidental Beneficiaries.

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give each beneficiary the benefit of the promises performance.

Sumitomo does not address this argument, but it has a definite degree of appeal. Any doubt in the Court's view is removed however upon consideration of the Debtor and Committee's third argument, which focuses on the rather fundamental notion of the meaning of a claim under the Bankruptcy Code.

In this respect, the Debtor and the Committee note that the term "claim" is broadly defined in § 101(5) of the Bankruptcy Code to include, among other things, "a right to payment, whether or not such right is reduced to judgement, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured ..." The Supreme Court has indicated that the term is synonymous with debt and was intended by Congress to be accorded the broadest possible interpretation. *Pennsylvania Department of Public Welfare v. Davenport,* 495 U.S. 552, 557, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). Consistent with this, in *Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), the high court held that a mortgagee whose debt, as evidenced by a promissory note, had been discharged in a Chapter 7 case still held a claim in its mortgagor's subsequent Chapter 13 case because the lien of its mortgage survived the Chapter 7 discharge and remained enforceable against the Debtor's realty. The *Johnson* case is instructive here because as the City (which agrees that "as a general matter" it does not have a claim against the Debtor for real estate taxes) notes in its brief, the City is empowered to enforce the lien it possesses for unpaid realty taxes on the encumbered property whether it is in the possession of the registered owner of the property or not. In this instance, the encumbered property consists of the Curtis Center land and buildings. Regardless of whether the Debtor directly owes the tax dollars the City, just as

the mortgagee in *Johnson,* is authorized to enforce a lien claim for the unpaid sums directly against the realty and its improvements by foreclosing and exposing the property to sale. The Court is persuaded that, as in *Johnson,* this right to enforce an obligation against property of the estate amounts to a claim as that term is used in the Bankruptcy Code. The Court accordingly concludes that the City of Philadelphia holds a claim in this case for the scheduled realty taxes, and that the potential exists for the treatment of this claim to be impaired in a manner which is acceptable to the claimant, thus rendering it theoretically possible for the Debtor to comply with the requirements of 11 U.S.C. § 1129(a)(10). At this juncture, the Court will not consider the myriad of other questions which Sumitomo would pose, such as whether the City will accept impaired treatment or whether it should. The inquiry at this juncture is focused on patent defects, and this important one has been satisfactorily addressed for now.

There are remaining problems, however. The most significant of which is the disparate treatment which the Debtor proposes for the unsecured claims of Sumitomo versus the Debtor's trade creditors, even if one assumes that separate classification of the two does not violate *John Hancock's* proscription against gerrymandering. The Court notes, as it did at the hearing of January 17, 1996, the obvious discriminatory treatment of Sumitomo versus the trade creditors and reiterates its serious reservations that the same will stand. The Debtor however argues persuasively that discrimination between classes is not *per se* prohibited, only unfair discrimination is prohibited. In this respect the Debtor argues that at a confirmation hearing it will justify the different treatment of Sumitomo's deficiency claim and show its proposed treatment of that claim to be the equivalent of the treatment of the unsecured trade creditors, giving due effect to such variables as risk and the time value of money. This strikes the Court as a rather tall order. Yet, the Debtor is undoubtedly correct that to push the inquiry further at this juncture would almost amount to transferring the instant contested matter into a mini-confirmation hearing. Controlling case law does not require this and the

Court declines any invitation to do so. The Court notes, too, that in the interim since proceedings herein were concluded, Sumitomo itself has filed a competing plan and disclosure statement. The Court views the best course at this juncture as being to have the parties' disclosure statements approved, so that the competing plans can be circulated, votes taken, and a confirmation hearing held to resolve the foregoing issue as well as numerous other open challenges to the amended plan lodged by Sumitomo.[4]

The second Sumitomo § 362 Motion (which is predicated on 11 U.S.C. § 362(d)(2) only) will therefore be denied on the basis that the amended plan of the Debtor cannot be said to be patently unconfirmable. The Clerk's Office in turn will be directed to schedule a consolidated hearing on both pending disclosure statements in order that both may be scheduled for a combined confirmation hearing.

4. And there are, as the Court notes, several including, inter alia, feasibility, the absolute priority rule and the proper application of the Debtor's post-petition adequate protection payments. In the latter respect the parties are referred once again to the Court's recent opinion in Duval, supra, for a discussion of this Court's view of the dispute between proponents of the so-called "addition" and "subtraction" theories in the context of post petition rents.