**In re CURTIS CENTER LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 95–12616 SR.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 13, 1996.

Frederic J. Baker, Asst. U.S. Trustee, Office of the U.S. Trustee, Philadelphia, PA.

Jeffrey Kurtzman and Morton R. Branzburg, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Debtor.

Thomas E. Biron and Regina Kelbon, Blank Rome Comisky & McCauley, Philadelphia, PA, for Sumitomo Trust & Banking Co.

Pauline K. Morgan, Clark Ladner Fortenbaugh & Young, Philadelphia, PA, for Official Committee of Unsecured Creditors.

Joseph A. Dworetzky, City Solicitor, and Cynthia E. White, Chief Deputy City Solicitor, City of Philadelphia Law Dept., Philadelphia, PA, for City of Philadelphia.

### *OPINION*

STEPHEN RASLAVICH, Bankruptcy Judge.

Before the Court is the request of the above Chapter 11 Debtor, Curtis Center Limited Partnership (the "Debtor"), for approval of its second amended disclosure statement relating to the Debtor's second amended plan of reorganization. Approval of the Debtor's second amended disclosure statement is vigorously opposed by the Debtor's principal secured creditor, the Sumitomo Trust & Banking Co., Ltd., New York Branch ("Sumitomo"), which maintains that the Debtor's second amended plan of reorganization is patently unconfirmable. Sumitomo has filed a competing plan and disclosure statement itself, and is presently seeking approval of its amended disclosure statement. For the reasons which follow, the Court concludes that approval of the Debtor's second amended disclosure statement must be denied. Sumitomo's amended disclosure statement, on the other hand, will be approved.

### *Background*

Sumitomo's opposition to approval of the Debtor's second amended disclosure statement is the latest episode in what the Court

has previously described as an ongoing *battle royale* between the Debtor and Sumitomo. *In re Curtis Center Ltd. Partnership*, 192 B.R. 648, 649 (Bankr.E.D.Pa.1996) ("*Curtis Center I*"). The facts underlying the filing of Debtor's Chapter 11 petition are, as follows:

> The Debtor is a Pennsylvania limited partnership formed in 1984 to acquire and renovate an historically certified twelve story office building located at 6th and Walnut Streets, Philadelphia, Pennsylvania. The building contains approximately 785,000 square feet of "rentable" commercial office space, 31,000 square feet of rentable retail space and 25,000 square feet of rentable storage space. There is also a 250 unit underground parking garage. The totality of ownership interests in the realty and its improvements is shared between the Debtor and its affiliated entity, Washington Square Limited Partnership. (hereinafter "Washington Square") That is to say, Washington Square owns the ground and the improvements, but has leased both to the Debtor pursuant to separate long term "land" and "building" leases.[1] Renovation of the property, has been completed for some years and was financed, in part, through a loan from Mellon Bank (East), N.A. ("Mellon"), and in part with some $38,000,000 in equity investments raised from the Debtor's limited partners. The building was further leveraged in January 1990 with a $95,000,000 working capital credit facility extended by Sumitomo. Sumitomo's three loans under the credit facility are evidenced by promissory notes and are secured, in their entirety, by a first mortgage lien on the combined interests in the realty and improvements of both the Debtor and Washington Square, as well as by a collateral assignment of tenant leases and rents. There also exists a related agreement which, *inter alia*, subordinates the entire Mellon indebtedness, as well as a junior secured mortgage debt of the Debtor to Washington Square, to the debt of Sumitomo. Sumitomo's loans were due to mature on June 13, 1995, however in April of the same year the Debtor and Washington Square defaulted by failing to remit a quarterly interest payment. That triggered the filing of the instant Chapter 11 case on April 4, 1995.

*Id.,* 192 B.R. at 651.

Sumitomo moved for relief from the automatic stay on June 6, 1995. In that motion, Sumitomo sought relief from the automatic stay under both subsections of 11 U.S.C. § 362(d). Sumitomo alleged that "cause" existed under 11 U.S.C. § 362(d)(1) because of the Debtor's inability to propose a confirmable plan. Relying on *In re Swedeland Development Group, Inc.,* 16 F.3d 552, 568 (3d Cir.1994) and *John Hancock Mutual Life Ins. v. Route 37 Business Park Associates,* 987 F.2d 154, 161 (3d Cir.1993), Sumitomo's position was, and remains today, that the Debtor cannot propose a confirmable plan since Sumitomo's claim is so woefully undersecured and its deficiency claim prevents the Debtor from proposing a plan which can satisfy the requisite elements of 11 U.S.C. § 1129 without Sumitomo's consent.

Sumitomo further alleged that "cause" existed for the entry of an Order modifying the stay under 11 U.S.C. § 362(d)(2) because (a) the Debtor has no equity in its interest in the Curtis Center and (b) the Debtor's interest in the Curtis Center is not necessary for an effective reorganization, since the Debtor cannot propose a confirmable plan and no reorganization is possible without the consent of Sumitomo.

An evidentiary hearing was held to consider Sumitomo's motion for relief from the automatic stay, among other matters not relevant here, on July 28, 1995. Evidence presented at the hearing established that Sumitomo's claim is indeed substantially undersecured. The crux of Sumitomo's argu-

---

1. Technically speaking, the Debtor apparently "owns" the building and related improvements for depreciation purposes under the terms of the building lease, but ownership thereof reverts back to Washington Square upon expiration of the lease term. Nevertheless, the Court determined in *Curtis Center I*, 192 B.R. at 660–62, that the City of Philadelphia is a tax creditor of the Debtor's bankruptcy estate.

ment that relief from the automatic stay was warranted, because the Debtor could not propose a confirmable plan without Sumitomo's consent, was based on two assumptions: first, Sumitomo assumed that given the size of its code created deficiency claim it would overwhelmingly dominate the class of unsecured creditors; and second, it assumed that without the accepting vote of the unsecured class (a possibility precluded by the negative note Sumitomo intended to cast), the Debtor would lack the accepting impaired class required under 11 U.S.C. § 1129(a)(10) and would therefore be unable to achieve cramdown of any reorganization plan under 11 U.S.C. § 1129(b).

The Debtor's response to the asserted futility of its prospects consisted of two arguments which are relevant for purposes of the instant dispute. The Debtor's principal rebuttable argument (upon which it still relies today) related to a pre-petition lender liability lawsuit initiated by the Debtor and Washington Square against Sumitomo and an entity known as Heitman/JMB Advisory Corporation. The Debtor maintained that the existence of this lawsuit created a sufficient distinction between the unsecured deficiency claim of Sumitomo, and the unsecured claims of other trade creditors, such that the Debtor could separately classify Sumitomo's unsecured deficiency claim in any plan it might later put forth. This, it asserted, would enable the Debtor to modestly impair the proposed treatment of its remaining trade creditors and, if such treatment were accepted by them, to still satisfy the requirements of 11 U.S.C. § 1129(a)(10). In the alternative, the Debtor implied that its success in the lender liability litigation might result in the reduction of Sumitomo's deficiency claim to an amount which might limit its ability to dominate the unsecured class.

Second, the Debtor asserted that leaving aside the class of unsecured creditors there would be other classes of creditors which would be impaired under its prospective reorganization plan, and whose acceptance of such treatment would enable it to satisfy the requirements of 11 U.S.C. § 1129(a)(10).

After considering the record and the arguments of the parties, and although the Court had preliminary skepticism as to the Debtor's ability to separately classify Sumitomo's deficiency claim, the Court nevertheless did not view the Debtor's ability to propose a potentially confirmable plan of reorganization to be so patently infeasible at that relatively early date as to require vacating the automatic stay under the guidelines of *John Hancock v. Route 37* and *Swedeland, supra.* Thus, despite Sumitomo's plethora of objections, and by Order dated August 1, 1995, the automatic stay was continued in effect.

The Debtor filed its initial plan and disclosure statement on October 13, 1995. The Debtor's initial plan divided its creditors into eight classes, and provided for Sumitomo's claims as follows:

*Class 1—Claim of the Sumitomo Trust & Banking Co., Ltd., New York Branch.* Class 1 shall consist of the Sumitomo Claim, as to which Sumitomo holds a first priority mortgage on the Property. Class 1 includes all of the claims of Sumitomo against the Debtor of any kind or nature whatsoever, including any unsecured deficiency claims, and no other claims of Sumitomo shall be included in or treated under any other class of claims under the Plan. Class 1 is impaired under the Plan.

On October 26, 1995, Sumitomo filed its second motion for relief from the automatic stay, together with a motion to terminate exclusivity so that Sumitomo might file its own plan. On November 13, 1995, Sumitomo followed up with a lengthy series of written objections to approval of the Debtor's disclosure statement, a hearing on which was scheduled for November 16, 1995. At the disclosure statement hearing Sumitomo renewed its argument that the Debtor's plan was patently unconfirmable because it lumped Sumitomo's deficiency claim in a single class with its secured claim or, put differently, that the plan was unconfirmable because it separately classified this unsecured claim from the claims of other unsecured creditors. When pressed by the Court to

address this issue, the Debtor offered only the argument it had advanced at the first § 362 hearing; to wit: that the pending lender liability litigation provided justification to separately classify Sumitomo's deficiency claim. The contested disclosure statement was thereupon taken under advisement by the Court pending the hearing scheduled for December 6, 1995.

When the hearing of December 6, 1995 was convened, the Court had not yet ruled on the adequacy of the Debtor's Disclosure Statement. At the outset the Court did, however, advise the parties of its view that its own reading of the Court of Appeals decision in *John Hancock v. Route 37, supra,* convinced it that the Debtor could not separately classify Sumitomo's deficiency claim if the same were for the purpose of enabling it to gerrymander for itself an accepting impaired class of creditors. The Debtor reiterated at this juncture its argument that the charge of gerrymandering was unfounded, and indeed a red herring, because the Debtor had various other classes of creditors whose treatment the Debtor intended to impair and whose acceptance of such treatment the Debtor anticipated. The Debtor nevertheless indicated an intention to amend the Disclosure Statement on the table. The parties thereupon stipulated to expiration of the Debtor's exclusivity period, and the Court adjourned the December 6, 1995 hearing to January 3, 1996, directing that the Debtor, within that time, put forward an amended disclosure statement and plan, free of any patent fatal flaws.

Consistent with the foregoing mandate, the Debtor filed amended schedules and an amended plan and disclosure statement on December 22, 1995.[2] Under its amended plan, the Debtor's creditors have expanded to ten classes. The two new classes consist of a separate class of its own for Sumitomo's deficiency claim and a separate class for tenants having offset rights (the "tenant offset class").

A continued hearing on Sumitomo's § 362 hearing was convened as scheduled on Janu-

ary 3, 1996, and concluded on January 17, 1996. At these hearings, the Court once again reiterated its skepticism as to both the separate classification of Sumitomo's unsecured claim, and the gerrymandering strategy it appeared to embody (as well as to the apparently discriminatory treatment proposed for the Sumitomo unsecured claim versus that proposed for the unsecured claims of general trade creditors.) In the former respect, the Court noted that while it was true that the Debtor's amended disclosure statement and plan included three potentially accepting impaired classes other than Sumitomo and trade creditors, the classes were all of suspect validity. The three classes in question consist of the City of Philadelphia, Mellon Bank and the tenant offset class.

The Court addressed the issue of whether acceptance of the impaired treatment under the Debtor's proposed plan by the City of Philadelphia, Mellon Bank or the tenant offset class would enable the Debtor to satisfy the requirements of 11 U.S.C. § 1129(a)(10) in *Curtis Center I.* 192 B.R. at 658–62. In this respect, the Court quickly concluded that the Debtor could not rely on either the acceptance of impaired treatment by the tenant offset class or Mellon Bank to satisfy the requirements of § 1129(a)(10). The Court then turned its attention to the question of whether the Debtor could rely on the acceptance of impaired treatment by the class consisting of the claims held by the City of Philadelphia. In doing so, the Court noted that the Debtor's amended schedules reflected claims held by the City of Philadelphia in two categories. First Schedule D (Secured Claims) reflects a debt of $1,573,466. This related to accrued real estate taxes. No proof of claim had been filed by the City with respect to the scheduled accrued real estate taxes. Additionally, Schedule E (Creditors Holding Unsecured Priority Claims) listed 2 City of Philadelphia claims, as follows:

---

**2.** Sumitomo filed its own disclosure statement and Chapter 11 plan of reorganization on January 24, 1996.

| Creditor Name and Address | Date Claim was Incurred Consideration for Same | Total Amount of Claim | Amount Entitled to Priority |
|---|---|---|---|
| City of Philadelphia Dept. of Revenue P.O. Box 1529 Philadelphia PA 19105 | 4/17/95 Business Privilege Tax | $55,207 | $55,207 |
| Center City District P.O. Box 8110 Philadelphia PA 19101–8110 | 3/31/95 1995 Center City District Charge | $91,979 | $91,979 |

The Court noted that there appeared to be little problem with the Debtor looking to the City's secured tax claim class as it potentially impaired class, and indeed the Debtor indicated its intention to so do. Sumitomo, however, challenged the standing of the City as a creditor of the Debtor with respect to unpaid real estate taxes. Specifically, Sumitomo pointed out that the registered owner of record of the tax parcels in question is not the Debtor but Washington Square. Thus, it is Washington Square and not the Debtor from whom the unpaid tax obligation runs. The Court determined, however, that the City of Philadelphia held a secured claim against the Debtor for the scheduled realty taxes, and that the potential existed for the treatment of this claim to be impaired in a manner which was acceptable to the City, thus rendering it theoretically possible for the Debtor to comply with the requirements of 11 U.S.C. § 1129(a)(10). *See Curtis Center I*, 192 B.R. at 660–62.

After making the above determination, the Court denied the second Sumitomo § 362 Motion on the basis that the amended plan of the Debtor could not be said to be patently unconfirmable. Within the Order of February 16, 1996, denying Sumitomo's § 362 Motion, the Court directed the Bankruptcy Clerk's Office to schedule a consolidated hearing on both pending disclosure statements so that, if approved, the Debtor and Sumitomo's plans might be scheduled for a combined confirmation hearing. A consolidated hearing to consider the Debtor and Sumitomo's disclosure statements and the objections thereto was scheduled for April 4, 1996.

During the period between February 16, 1996 and the scheduled disclosure statement hearings, Sumitomo apparently paid the City of Philadelphia's secured tax claim against the Debtor for pre-petition real estate tax claims in full. The Debtor's remaining obligations to the City were thus reduced to two claims: $91,979 for Center City District charges and $55,207 for business privilege taxes.

On April 1, 1996, the Debtor filed a second amended disclosure statement and second amended plan of reorganization. In its second amended disclosure statement and plan, the Debtor proposes to separately classify the "sum of $150,000 ... [representing] all pre-petition taxes, interest, penalties, additions and other charges still owing to the City of Philadelphia." *Id.*, at 19, "Allowed Claim of the City of Philadelphia"—Class 4. That is, the Debtor's newly proposed Class 4 is made up of the City's claims for the $91,979 Center City District charges and $55,207 business privilege taxes.

Sumitomo has filed objections to the Debtor's second amended disclosure statement contending, once again, that the Debtor's plan is patently unconfirmable without its consent, and, that approval of the Debtor's second amended disclosure statement should therefore be denied. Sumitomo also renews its objection to the separate classification of its unsecured deficiency claim from the class of general unsecured claims.

Sumitomo, additionally, has interposed a specific objection to the proposed separate classification of the City of Philadelphia's two remaining claims.[3] Sumitomo argues that

3. At the time that *Curtis Center I* was decided, the Debtor's first amended disclosure statement

both of the remaining claims of the City of Philadelphia are unsecured priority tax claims which cannot comprise a class of claims pursuant to 11 U.S.C. § 1123(a)(1). The City, it is urged, cannot therefore be considered as the potentially impaired accepting class for purposes of 11 U.S.C. § 1129(a)(10). In the alternative, Sumitomo argues that if the Court determines that either of the City's remaining claims are not priority tax claims, they must be general unsecured claims properly classified in Class 6—Allowed General Unsecured Claims. The issue of whether the City's claims are unsecured priority tax claims has been fully briefed by the parties, and thus the Court will turn its consideration to the issue of whether the Debtor's latest disclosure statement and plan propose a viable class that could foreseeably accept impaired treatment of its claims, thus rendering it theoretically possible for the Debtor to comply with the requirements of 11 U.S.C. § 1129(a)(10).

***Discussion***

■ If a class rejects a proposed plan of reorganization, the Court may nevertheless confirm the plan over the objection of the impaired class so long as it "does not discriminate unfairly, ... is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan," and the other requirements of confirmation are met. 11 U.S.C.

and plan of reorganization provided for the City of Philadelphia's claims in Class 4, as follows: *Class 4* shall consist of the Allowed Claims of the City of Philadelphia for pre-petition real estate taxes, and any other taxes, fees and charges due and owing to the City of Philadelphia as of the Petition Date. Class 4 is impaired under the Plan.

Since the City's large secured tax claim was included within Class 4, it was not immediately apparent that the Debtor intended to also include priority tax claims within the class. In this respect, however, the Debtor's intention is now express and apparent. The Debtor's first amended disclosure statement provided for other priority claims in Class 5, as follows: Class 5 shall consist of the Allowed Claims of any Claimant to the extent that any such Claims are entitled to priority under Section 507 of the Bankruptcy Code, *other than Allowed Class 4 Claims.* Class 5 is not impaired under the Plan.

**4. 11 U.S.C. § 1129. Confirmation of Plan**

(a) The Court shall confirm a plan only if all of the following requirements are met:

§ 1129(b)(1). Section 1129(b)(1) is commonly known as the "cramdown" provision. Before a plan can be crammed down, at least one noninsider impaired class of claims must vote to accept it. *See* 11 U.S.C. § 1129(a)(10).[4]

**I.**

In the case *sub judice,* the Debtor is attempting to propose a viable cramdown plan over Sumitomo's objection. In that attempt, the Debtor proposes a second amended disclosure statement and plan of reorganization which includes five noninsider impaired classes of claims. Class 2 consists of Sumitomo's unsecured deficiency claim, approximately $50,000,000. Class 3 is composed of Mellon Bank's unsecured (deficiency) claim, approximately $25,000,000. Class 4, as noted above, is made up of the City of Philadelphia's claims for $91,979 in Center City District charges and $55,207 in business privilege taxes. Class 6 consists of allowed general unsecured claims against the Debtor, excluding the unsecured deficiency claims of Sumitomo or Mellon, any Insider Unsecured Claims, and any claims relating to Tenant Security Deposits. Class 9 is made up of the allowed claims of tenants for refunds of security deposits (the "tenant security deposit class").

. . . .

(10) If a class of claims is impaired under the Plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.
11 U.S.C. § 1129(a)(10). As the court in *In re 266 Washington Associates* explained,
Section 1129(a)(10) operates as a statutory gatekeeper barring access to cramdown where there is absent even one impaired class accepting the plan. Cramdown is a powerful remedy available to plan proponents under which dissenting classes are compelled to rely on judicial valuations, judgments and determinations. The policy underlying § 1129(a)(10) is that before embarking upon the tortuous path of cramdown and compelling the target of the cramdown to shoulder the risks of error [and related expenses] necessarily associated with a forced confirmation there must be some other properly classified group that is also hurt and nonetheless favors the plan.
*Id.,* 141 B.R. 275, 287 (Bankr.E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y.1992).

The Debtor cannot expect an acceptance of impaired treatment from Class 2, Sumitomo's unsecured deficiency claim. Sumitomo has consistently stated matter of factly that it will not vote in favor of any plan proposed by the Debtor. In *Curtis Center I*, the Court determined moreover that the Debtor cannot rely on the acceptance of impaired treatment by Mellon Bank to satisfy the requirements of 11 U.S.C. § 1129(a)(10). The tenant security deposit class has been found to be "[in]sufficiently weighty" under the guidelines set forth by the Third Circuit in *John Hancock v. Route 37*, and accordingly acceptance of impaired treatment by Class 9 will not satisfy the requirements of § 1129(a)(10). The Debtor therefore must either obtain an accepting vote from its proposed Class 4 or Class 6 to satisfy the requirements of § 1129(a)(10). If the Debtor cannot, its proposed plan would not comply with the requirements of § 1129.

As previously noted, Sumitomo challenges the validity of Class 4 under § 1123(a)(1), and, as it has from the earliest stages of the Debtor's case, maintains that the Court should not sustain the separate classification of its unsecured deficiency claim from the Debtor's class of general unsecured claims (Class 6). If Sumitomo is correct that Class 4 is an invalid class, and that its unsecured deficiency claim should be placed within Class 6, the Debtor will not be able to satisfy the requirements of § 1129(a)(10) (without Sumitomo's accepting vote). In this respect, the Court notes its agreement with the proposition that a disclosure statement should be disapproved where the plan it describes is patently unconfirmable. *See In re Eastern Maine Electric Co-op., Inc.*, 125 B.R. 329, 333 (Bankr.D.Me.1991); *see also, In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr.E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y.1992); *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr.D.Mass.1991); *In re Atlanta West VI*, 91 B.R. 620 (Bankr. N.D.Ga.1988); *In re Monroe Well Service, Inc.*, 80 B.R. 324, 333 (Bankr.E.D.Pa.1987); *In re Pecht*, 57 B.R. 137, 139 (Bankr.E.D.Va. 1986). Thus, in order to avoid disapproval of its proposed disclosure statement, the Debtor must establish either: (1) that the proposed separate classification of the City of Philadelphia's remaining claims creates a viable class under 11 U.S.C. § 1123(a)(1), which proposal has not been made solely for the purpose of obtaining the accepting vote of such impaired class; or (2) that it does not proposed separate classification of Sumitomo's unsecured deficiency claim from the claims of the general unsecured creditors solely for the purpose of obtaining an accepting vote by an impaired class. *See In re Boston Post Road Ltd. Partnership*, 21 F.3d 477, 483 (2d Cir.1994) (a "debtor must adduce credible proof of a legitimate reason for separate classification of similar claims"); *accord, In re Johnston*, 21 F.3d 323 (9th Cir.1994). If the Court determines that the Debtor has not sustained this burden, the Debtor's second amended disclosure statement must be disapproved.

## 11 U.S.C. § 1122. Classification of Claims or Interests

■ The statutory provision governing the classification of claims, § 1122(a), expressly provides only that claims that are not substantially similar may not be placed in the same class.[5] Section 1122(a) does not expressly provide, however, that substantially similar claims may not be placed in separate classes. *John Hancock v. Route 37*, 987 F.2d at 158. It is clear, nevertheless, that the Bankruptcy Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes. *Id.* In that regard, the Third Circuit explained in *Matter of Jersey City Medical Center*, 817 F.2d 1055, 1061 (3d Cir.1987), that:

> there must be some limit on a debtor's power to classify creditors in such a manner [to assure that at least one class of impaired creditors will vote for the plan and make it eligible for cram down consideration by the court]. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would

---

5. 11 U.S.C. § 1122. **Classification of Claims or Interests**

Section 1122 provides:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests.

11 U.S.C. § 1122(a).

stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*Id.,* quoting *In re U.S. Truck Co., Inc.,* 800 F.2d 581, 586 (6th Cir.1986) (footnote omitted).

The *Jersey City Medical Center* court was reviewing a classification scheme that created three impaired classes—one consisting of alleged medical malpractice victims, one consisting of employee benefit non-priority claims, and the other consisting of other unsecured creditors. Without explaining why, the Third Circuit simply "noted *the reasonableness of distinguishing the claims* of medical malpractice victims, employee benefit plan participants, and trade creditors." *Id.* (emphasis added).

■ In *John Hancock,* the Third Circuit attempted to "spell out the factors that should be considered in determining whether a classification scheme is *reasonable." Id.,* 987 F.2d at 159 (emphasis added). In that regard, the court explained:

> it seems clear to us that [a reasonableness] determination must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed (*see* 11 U.S.C. § 1129(a)(8), (10) (1988)) and treatment of claims under the plan (*see* 11 U.S.C. § 1123(a)(4) (1988)). Thus, where, as in this case, the sole purpose and effect of creating multiple classes is to mold the outcome of the voting, *it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed.* Otherwise, the classification scheme

would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10) (1988).

*Id.* (emphasis added). With those principles in mind, the Court turns its consideration to the Debtor's proposed classification scheme.

### Classification of the City of Philadelphia's Claims

■ Sumitomo's argues that both of the City of Philadelphia's remaining claims are pre-petition unsecured tax claims, which are entitled to priority under 11 U.S.C. § 507(a)(8), and which cannot therefore comprise a class of claims pursuant to 11 U.S.C. § 1123(a)(1).[6] Thus, Sumitomo argues, a class comprised solely of the City of Philadelphia's claims cannot be considered as the Debtor's potential impaired accepting class for purposes of 11 U.S.C. § 1129(a)(10). This Court, as well as the majority of the courts which have addressed the issue, agrees. *See, e.g., In re Union Meeting Partners,* 165 B.R. 553, 568–69 (Bankr.E.D.Pa. 1994), *aff'd,* 52 F.3d 317 (3d. Cir.1995), citing *Travelers Ins. Co v. Bryson Properties XVIII (In re Bryson Properties XVIII),* 961 F.2d 496, 501 n. 8 (4th Cir.), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992) ("[P]riority tax claimants, which receive preferential treatment under the Code ..., are not an impaired class that can accept a plan and bind other truly impaired creditors to cramdown."); *see also, In re Perdido Motel Group, Inc.,* 101 B.R. 289 (Bankr. N.D.Ala.1989).

■ The Debtor, for its part, does not argue that a class of pre-petition unsecured tax claims entitled to priority under 11 U.S.C. § 507(a)(8) can serve as an accepting impaired class for purposes of § 1129(a)(10), it argues instead that the Center City District charge "does not fall into the priority categories described in section 507(a)(8)."[7]

---

6. Section 1123(a)(1) provides:

> (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
> (1) designate, subject to section 1122 of this title, classes of claims, other than claims specified in section 507(a)(1), 507(a)(2), *507(a)(8)* of this title, and classes of interests. (emphasis added).

7. The Debtor apparently concedes that the City's $55,207 claim for business privilege taxes falls within the provisions of § 507(a)(8). Even if the Debtor did not so concede, the Court, for the reasons discussed below regarding the relative insignificance of the Center City District charge, would have reached the conclusion that, in the face of Sumitomo's enormous deficiency claim, a class of claims consisting of the City's business

Section 507(a)(8) provides, in relevant part, that

(a) The following expenses and claims have priority in the following order:

.    .    .    .    .

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

.    .    .    .    .

(B) a *property tax assessed* before the case and last payable without penalty after one year before the date of the filing of the petition.

11 U.S.C. § 507(a)(8)(B) (emphasis added). The Court notes that a "property tax" is defined as a "[g]eneric term describing a tax levied on the basis of [the assessed] value of either personal or real property owned by the taxpayer." Black's Law Dictionary 1308 (5th ed. 1979).

Here the Debtor argues, without any explanation, that rather than a property tax the Center City District charge is a "municipal charge assessed by the City, a quasi-governmental instrumentality of the City," which does not fall within the parameters of § 507(a)(8)(B) or, for that matter, any other provision of § 507(a)(8). Sumitomo argues, on the other hand, that the Center City District charge is a property tax imposed on the value the Debtor's real estate, and therefore a tax of a governmental unit entitled to priority under § 507(a)(8). Before discussing the relative merits of the parties' arguments, a brief description of the origin and particularly the funding for the Center City District is warranted.

Under the Municipal Authorities Act of 1945, P.L. 382, the City authorized the creation of an entity known as the Special Services District of Central Philadelphia, the predecessor to the Center City District, which was approved by ordinance on March 28, 1990, as amended by ordinance—Bill No. 1069 (hereinafter the "Amended Ordinance"), dated April 7, 1992. The Amended Ordinance sets forth a detailed 5–year plan for certain business improvement and adminis-

trative services to be provided within the Center City District. In particular, the funding provision of the Amended Ordinance, which appears under the subheading *Income From Charges Proposed Method Of Assessment,* provides that the funding for the District's 5–year plan is to be derived from charges against "assessments on all taxable properties within the district." *Id.*

The language of the Center City District funding provision that the "charge" is an assessment on taxable property clearly appears to support Sumitomo's position that the Center City District charge is a property tax (based on the assessed value of the Debtor's real estate) within the meaning of 11 U.S.C. § 507(a)(8). The Debtor offered no reasonable explanation why the Center City District charge is not a property tax within the meaning of § 507(a)(8), and moreover has itself characterized the Center City District charge as an assessment. Furthermore, the Debtor's current position is inconsistent with its own previous characterization of the Center City District charge. In its Amended Summary of Schedules filed on May 2, 1995, the Debtor listed the Center City District charge on Schedule E—*Creditors Holding Unsecured Priority Claims.* For these reasons, the Court concludes that the Center City District charge is a property tax within the meaning of § 507(a)(8), which cannot, as noted, comprise a class of claims under 11 U.S.C. § 1123(a). Therefore, the Court concludes that the Debtor cannot rely on the Center City District charge as its potentially accepting impaired class for purposes of 11 U.S.C. § 1129(a)(10).

■ Even if the Court agreed with the Debtor that the Center City District charge is not a priority property tax under § 507(a)(8), the Center City District charge is arguably nothing more than a (relatively) small unsecured claim of the City, which cannot be separately classified under the standards set forth in *John Hancock Mutual Life Ins. v. Route 37 Business Park Associates,* 987 F.2d at 158–159. A "classification

privilege tax and Center City District charge is not "sufficiently weighty" to merit a separate and potentially controlling voice in the decision

whether this proposed reorganization should proceed.

scheme must provide a reasonable method for counting votes. In a cramdown case, this means that each class must represent a voting interest that is [both] *sufficiently distinct and weighty* to merit a separate voice in the decision whether the proposed reorganization should proceed." *Id.* at 159 (emphasis added).

The Debtor has taken the position that the Center City District charge is a municipal assessment charge assessed by the City (which "does not fall into the priority categories described in § 507(a)(8)"). In that regard, Sumitomo's argues that the Center City District charge, if it is not a priority tax under § 507(a)(8), is nothing more than an unsecured claim until such time as the City files a lien (which it has not done). The Court notes, on the other hand—however, that certain municipal liens arise automatically by statute, particularly real estate taxes, *see, e.g.,* 72 Pa.C.S.A. § 3341, and accordingly it is not necessarily manifest that a legal distinction sufficient to support separate classification of the claim is not in fact present in this instance. Notwithstanding that, even if a sufficient distinction were present here, it must be noted that Sumitomo's unsecured deficiency claim is in the approximate amount of $50,000,000. In *Curtis Center I,* the Court determined that Sumitomo is entitled to cast Mellon's Bank vote on the plan. *Id.,* 192 B.R. at 660. Mellon Bank's unsecured claim is approximately $25,000,000. On these facts, it is evident that a proposed class consisting of the City of Philadelphia's $91,979 Center City District claim clearly does not represent a voting interest that is "sufficiently weighty" to merit a separate, and possibly controlling voice in the fundamental decision of whether this proposed reorganization should proceed. The Court concludes therefore, once again, that the Debtor cannot rely on the City's of Philadelphia's claim for purposes of § 1129(a)(10). Thus, the viability of the Debtor's second amended disclosure statement and second amended plan comes down to the issue of whether the Debtor can separately classify Sumitomo's deficiency claim from the class of the general unsecured creditors.

### Classification of Sumitomo's Unsecured Deficiency Claim

█ The Debtor argues, as it has on several earlier occasions, that the existence of its pending lender liability claim litigation against Sumitomo in the federal district court creates a sufficient distinction between the unsecured deficiency claim of Sumitomo, and the unsecured claims of other trade creditors, such that the Debtor can separately classify Sumitomo's unsecured deficiency claim without violating the guidelines set forth by the Third Circuit in *John Hancock.* In support of that argument, the Debtor relies on the holding of the Ninth Circuit in *Steelcase Inc. v. Johnston (In re Johnston),* 21 F.3d 323 (9th Cir.1994), wherein the Ninth Circuit Court of Appeals allowed the debtor to separately classify the claims of its other general unsecured creditors from the claim of a single unsecured creditor, Steelcase, whose claim was subject to pending litigation.

Turning first to the teachings of the Third Circuit, the Court notes preliminarily that unlike the Ninth Circuit's decision in *Johnston,* neither *Jersey City Medical Center* nor *John Hancock* involved a separate classification proposed on the basis of a pending lawsuit against the sole claimant in one of those separated classes. Leaving this observation aside, however, the Court notes that the determinative test in the Ninth Circuit, as well as in the Third Circuit, as to whether to approve separate classification of claims or disapprove separate classification is, at bottom, the same test.

In *Johnston,* the Ninth Circuit determined that bankruptcy judges must evaluate the nature of each claim, i.e., the kind, species or each category of claims in order to determine whether to approve separate classification of claims or disapprove separate classification. *Id.,* 21 F.3d at 327. In *Jersey City Medical Center,* the Third Circuit relied on "the *reasonableness* of distinguishing the claims of medical malpractice victims, employee benefit plan participants, and trade creditors," to allow separate classification. *Id.,* 817 F.2d at 1061 (emphasis added). In its attempt to "spell out the factors that should be considered in determining whether a classification

scheme is 'reasonable,'" the *John Hancock* court said that reasonableness "means that each class must represent a voting interest that is *sufficiently distinct* and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed." *Id.*, 987 F.2d at 159 (emphasis added). Applying these standards together, the Court finds that for present purposes the proposed separate classification of Sumitomo's deficiency claim from the unsecured claims of trade creditors is justified only upon a showing that the legal characteristics of their claims are different.

Turning to the case *sub judice,* the Court finds Debtor's arguments to be unavailing. In the first instance, the Court notes that in contrast to the claims of the *Jersey City Medical Center* separately classified creditors, there is no difference between the legal characteristics of Sumitomo's unsecured deficiency claim and the claims of the Debtor's other unsecured creditors, simply because Sumitomo's unsecured deficiency claim is the subject of pending litigation.[8] Unsecured claims are basically all alike, whether they are disputed or not. *In re Mastercraft Record Plating, Inc.,* 32 B.R. 106, 108 (Bankr. S.D.N.Y.1983), *rev'd on other grounds,* 39 B.R. 654 (S.D.N.Y.1984). Sumitomo and the other unsecured creditors are claimants of equal rank entitled to share pro rata in the value of the Debtor's assets remaining after payment of secured and priority claims. The Court's conclusion in this respect is in accord with another recent bankruptcy court decision which considered the same classification issue in a single asset case.

In *In re Midway Investments, Ltd.,* 187 B.R. 382 (Bankr.S.D.Fla.1995), the bankruptcy court concluded that the debtor misclassified its first mortgagee's unsecured deficiency claim from the claims of trade creditors in the plan. The court explained that:

> Midway has segregated Aetna's unsecured claim of approximately $6.3 million dollars, which it disputes, from undisputed unsecured claims. Midway does not disclose whether any other unsecured claims have been classified as disputed, and it is possible Aetna will be the sole member of its class. The discrimination against disputed claims was specifically disapproved in *In re ARN. [LTD.] Limited Partnership,* 140 B.R. 5 (Bankr.D.D.C.1992). The court concluded that the legal status of the claim, not its disputed or undisputed status, was the proper focus of classification. *See also In re Weiss–Wolf, Inc.,* 59 B.R. 653, 655 (Bankr.S.D.N.Y.1986) and *In re Mastercraft Record Plating, Inc.,* 32 B.R. 106, 108 (Bankr.S.D.N.Y.1983), *rev'd on other grounds,* 39 B.R. 654 (S.D.N.Y.1984). [The debtor's] separate classification of disputed unsecured claims is an attempt to gerrymander the voting process to facilitate the affirmative vote of an impaired class of claims and thereby satisfy Section 1129(a)(10).

*Midway Investments, Ltd.,* 187 B.R. at 392. In the Court's view, the instant Debtor's separate classification of Sumitomo's unsecured deficiency claim is likewise simply an

---

**8.** As previously discussed, *Jersey City Medical Center* involved a classification scheme that created three impaired classes—one consisting of alleged medical malpractice victims, one consisting of employee benefit non-priority claims, and the other consisting of other unsecured creditors. In discussing the classification scheme proposed for the three impaired classes, the Third Circuit said "we immediately note the reasonableness of distinguishing the claims of (physicians—whose claims were unimpaired), medical malpractice victims, employee benefit participants, and trade creditors." *Id.,* 817 F.2d at 1061. The physicians claims arose out of agreements with the debtor for indemnity against alleged malpractice awards; the medical malpractice claims arose from the alleged negligence of the debtor's agents; the employee benefit awards arose pursuant to existing employment agreements; and

the claims of the trade creditors apparently arose in the ordinary course of the debtor's business.

The different origins of the claims, standing alone, would not justify separate classification, if the claims were all of similar legal character. *In re Boston Post Road,* 21 F.3d at 483. It was apparent to the Third Circuit in *Jersey City Medical Center,* however, that it was reasonable to distinguish the claims before it because they had different legal characteristics. For example, under the debtor's plan, payment to the physicians and medical malpractice victims were to be made directly from an insurance fund. The physicians were to receive 100% of their claims, and the medical malpractice victims were to receive 30% of their claims. The employees and trade creditors were to receive their distribution from a "surplus fund" established through the plan.

attempt to gerrymander the voting process to facilitate the affirmative vote of an impaired class of claims and thereby satisfy § 1129(a)(10).

The Debtor's citation to *In re Johnston* is unpersuasive. *Johnston* involved two separate bankruptcy filings. An individual named Johnston filed a voluntary Chapter 11 petition for reorganization of his business. At that time, he was also the chief executive officer and majority shareholder of Capital Office Systems, Inc. ("COSI"). The day after Johnston filed his Chapter 11 petition, COSI filed its own Chapter 11 petition. Steelcase filed claims in both bankruptcies. Specifically, Steelcase claimed that it was owed money for inventory delivered to COSI pursuant to open-credit financing personally guaranteed by Johnston. On the same day that the COSI bankruptcy petition was filed, COSI and Johnston filed a breach of contract action against Steelcase in state court which was subsequently removed to the federal court.

Johnston's confirmed second amended reorganization plan listed 26 classes. The plan disputed Steelcase's claim, which was separately classified, and payment of the claim was contingent upon the success of the pending litigation. Steelcase objected to the plan on the grounds that it improperly placed similar unsecured claims in separate classes.

The Ninth Circuit began its analysis by identifying the test a bankruptcy court should implement to either deny or approve separate classification. In that regard, the court determined that bankruptcy judges must evaluate the nature of each claim, i.e., the kind, species or each category of claims. *Id.*, 21 F.3d at 327. After making that determination, the *Johnston* court found that Steelcase's separate classification under the confirmed plan did not violate § 1122(a) because "the legal character of [Steelcase's] claim was *not* 'substantially similar to the other claims or interests of [the] classes' [in which Steelcase contended its claim should be placed, classes 19, 20 and 22]." *Id.* at 328 (emphasis in original).

While the Ninth Circuit did conclude that "the bankruptcy court did not commit clear error in allowing the separate classification of Steelcase's claim, because Steelcase was the only creditor whose claim was currently being litigated, the court's conclusion was bolstered by the following: Class 19 of Johnston's plan was comprised of disputed unsecured claims secured by valid, perfected liens against the property of COSI; Class 20 was comprised of unsecured claims based on guarantor liability, and Class 22 was comprised of unsecured claims for which Johnson was solely responsible. Steelcase, on the other hand, held a partially secured interest in COSI, which, in the Ninth Circuit's view, accorded Steelcase a different status than the Class 19, Class 20, and Class 22 claimants. The Court was also influenced, moreover, by the fact that if Steelcase was successful in the litigation, it would receive full payment of its claim within 120 days following entry of judgment, ahead of the projected payment to the other unsecured claimants which were to receive extended monthly payments under the plan. For all of these reasons, the court concluded that Steelcase's claim had different legal characteristics than the other classes.

It is noteworthy also that implicit within the *Johnston* decision is the fact that the court found no evidence that separate classification was proposed in order to secure the vote of an impaired class. While the instant Debtor argues that its classification scheme is not proposed solely for the purpose of securing the vote of an impaired class, the Court is unpersuaded and finds that the record does not bear out that assertion. The Debtor's strident attempts to separately classify the claims of Mellon Bank, its lone tenant with an offset right, and the City of Philadelphia's Center City District charge and business privilege taxes, in this Court's determination, is convincing evidence that the Debtor's entire classification scheme has been proposed solely for the purpose of securing the vote of an impaired class, an admittedly significant hurdle which has been readily apparent to everyone involved since the very inception of this case.

For all of the above reasons, the Court will enter an Order disapproving the Debtor's second amended disclosure statement.

## II.

Sumitomo filed its original disclosure statement and plan of reorganization on January 24, 1996. Sumitomo then filed an amended disclosure statement and amended plan of reorganization on April 2, 1996, to which the Debtor filed objections. At the consolidated disclosure statement hearing on April 4, 1996, the Debtor withdrew its objections to Sumitomo's disclosure statement. Since the Court has determined that Sumitomo's amended disclosure statement satisfies the requirements of 11 U.S.C. § 1125, Sumitomo's amended disclosure statement will be approved upon its submission of a blacklined copy reflecting the minor revisions discussed on the record at the consolidated disclosure statement hearing held on April 4, 1996.[9]

---

9. Specifically, Sumitomo advised the Court that: (1) its amended disclosure statement contains a miscalculation of its debt; and (2) if the Debtor's disclosure statement is not approved, its amended disclosure will need to be corrected to so provide.